UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
CAROLYN JOHNSON

                       :

             Plaintiff,

                       :

          -against-

                       :

FORDHAM UNIVERSITY and
ANTHONY CIORRA,

                       :

           Defendants.   :
---------------------------------x

7/24/15

REPORT & RECOMMENDATION

11 cv. 4670 (ALC)(MHD)

TO THE HONORABLE ANDREW L. CARTER, U.S.D.J.:

      Plaintiff Carolyn Johnson, formerly an employee of Fordham University, filed this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.. She asserted claims for alleged gender-based discriminatory mistreatment by the University and her immediate supervisor, Father Anthony Ciorra, during her brief employment by Fordham, and for discriminatory termination and retaliation. She named as defendants the University and Father Ciorra. Following discovery, the parties entered into settlement negotiations, supervised in part by the court. These discussions resulted in general agreement at a conference on March 18, 2015 on certain basic terms for resolving the case, which the court recited on the record, noting that the agreement was contingent on the signing of a written instrument. The parties proved unable to agree on the terms required for a written settlement document, and in the

1

wake of that failure and the plaintiff's repudiation of at least one of the provisions initially agreed to at the March 18 conference, defendants have moved for an order enforcing terms that they believe were agreed to at some point in this process.

Following oral argument, we advised the parties that we found no basis to grant the relief sought by defendants and offered a brief explanation. We now address in more specific terms the reasons for that conclusion.

The March 18 Conference

Our first settlement conference was conducted on September 6, 2014, but it yielded no agreement on any terms. We then met with counsel and their respective clients (other than Father Ciorra) on March 18, 2015. Through extended discussions, the parties agreed on certain basic items to resolve the case and those terms were placed on the record. Specifically, Fordham agreed to pay plaintiff a specified sum, and it was agreed that the settlement would also include a provision for confidentiality of the terms of the settlement, a so-called non-disparagement provision that was to be mutual, and a bar on plaintiff applying for future employment with Fordham. Because of the difficulty in reaching these agreements,

2

the parties did not negotiate at that time any other issues, including the details of what would be entailed by the non-disparagement requirement, although defendants made clear that they wanted a liquidated-damages provision to incentivize plaintiff to comply with that requirement, which was plainly central to defendants' willingness to resolve the case. Thus at the conclusion of the conference, we stated on the record the following:

> After extended discussion, the parties have reached agreement on basic terms to resolve this lawsuit. The terms include a payment in full satisfaction of all claims and fees as well of [a specific sum] by defendant.

> In addition, the parties agree there will be a confidentiality provision regarding terms of the settlement; that there will also be a provision for non-disparagement by both sides of each other; and that plaintiff agrees not to apply for [a] position at Fordham, and that no such position will be provided to her.

> The agreement is, of course, contingent on the drafting of a written settlement agreement which the attorneys on both sides will undertake to do promptly.

(March 18, 2015 Tr. 2).

We are advised that, in the wake of this conference, counsel on both sides undertook negotiations with regard to the details of what should be included in the written agreement. We further understand that, in or about early April, defendants' attorneys conveyed a draft Settlement Agreement and General Release (Doc. #

3

103-1) to plaintiff's counsel. Not surprisingly, it included numerous terms that had not been discussed at the settlement conference, but it also embodied a few that were plainly inconsistent with the previously agreed-upon terms.

Among other items, the draft provided that Dr. Johnson was prohibited not only from disclosing the terms of the agreement, but from disclosing "any facts concerning or underlying her employment with and separation of employment from Fordham" except for the fact of her having been employed at Fordham. (Settlement Agreement ¶ 19). It further prohibited her from communicating to anyone the fact that she had sued or that there had been a settlement. (Id.). The draft specified as well that in the event of a violation of these requirements, she would be required to pay a liquidated damage amount of $75,000.00 per violation. (Id.). The draft did not limit defendants' right to disclose any settlement terms.

The non-disparagement provision prohibited plaintiff from making any "statements . . . that are derogatory or detrimental to the good name or reputation of Fordham", as well as that of co-defendant Father Ciorra and non-party Father Joseph McShane. (Id. ¶ 20). The draft, however, did not include any prohibition on the making of derogatory statements by defendants concerning the

4

plaintiff. It also included a liquidated-damages provision calling for payment of $75,000.00 per violation by plaintiff. (Id.).

The draft, which specified that it "supercede[] any and all agreements, whether written or oral, between Johnson and Fordham" (id. ¶ 2), also included numerous other provisions, spanning 13 pages of text. These included detailed descriptions of the plaintiff's waiver of claims and the scope of her release (id. ¶¶ 3, 4, 8, 17), the timing of payment following "execution" of the agreement (id. ¶¶ 5, 11(B)), the timing of a stipulation of dismissal (also keyed to "execution") (id. ¶ 5(E)), detailed tax provisions (id. ¶¶ 6,7), and equally detailed Medicare and Medicaid sections. (Id. ¶¶ 12-16). Finally, we note that the draft by Fordham included a provision, stated to be mandated by the Older Workers Benefit Protection Act (OWBPA"), 29 U.S.C. § 636(f)(1)(G), under which plaintiff was given "the right to cancel this Agreement within seven (7) days from execution." (Id. ¶ 11(B)).

The parties proved unable to resolve their differences, and accordingly we conducted a follow-up conference on May 5, 2015. At that encounter, plaintiff's attorney identified, as the three sources of the stalemate, (1) the scope of the confidentiality provision, which broadly exceeded the concept of confidentiality as

5

to the settlement terms; (2) the absence of mutuality in the non-disparagement provision; and (3) the liquidated-damages provisions. In explanation for the harsher provisions embodied in the draft and their deviation from the terms stated at the March 18 conference, counsel for defendants advised that they had learned in the interim that plaintiff had sent two letters to the Pope recounting her alleged travails at Fordham, disclosing the terms of the proposed settlement and asking for his advice or intervention.

At the May 5 conference, although Fordham's counsel offered to agree to a mutual non-disparagement provision, to narrow the scope of the confidentiality provision and to reduce the amount of the liquidated-damages provision or even possibly to eliminate it, plaintiff declined to agree, and reported that she no longer was prepared to accede to a non-disparagement provision, even if that refusal cost her the ability to settle the case. With the parties at stalemate, defendants announced their intention to move to enforce "the settlement". Following an equally stalemated telephone conference on May 8, 2015, defendants have now taken that step.

The Motion

Both sides cite the standards commonly recognized for

6

determining whether an oral settlement agreement is enforceable. In substance, defendants argue that all of the material terms were agreed to at the March 18 conference, and that the court either misspoke or did not mean literally what it said when it noted at the time that the agreement was contingent on a written contract being arrived at. (Defts' Mem. 2-13; Defts' Mem. In Further Support 2-9). Plaintiff argues that it was understood at the conference that a written agreement was needed, that none could be achieved subsequent to the conference, that the disagreements concerned material terms, that Fordham had since repudiated the limited terms agreed to at the March 18 conference in view of the contents of its draft Settlement Agreement, and that in any event Dr. Johnson had never agreed to a non-disparagement provision as understood by Fordham, since she believed that the prohibition would be solely against her speaking untruthfully. (Pl's Mem.2-17; Johnson Decl. ¶¶ 2-21).[1]

---

[1] At oral argument we observed that the last-stated proposition -- that Dr. Johnson could reasonably have believed that the non-disparagement provision precluded only untruthful statements -- was baseless. We reiterate that observation here, based on the court's explicit explanation to her at the March 18 conference of the meaning and effect of a non-disparagement requirement. We further note that plaintiff is highly educated and indeed asserts that she is qualified to teach at a respected university, and surely understands plain English.

7

ANALYSIS

## I. The March 18 Oral Agreement on Terms Was Not Binding

### A. Standards

Defendants correctly note that, as a general rule, oral settlement agreements entered into by the parties before the court are valid and enforceable. See Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007) (noting a "voluntary, clear, explicit, and unqualified stipulation of dismissal entered into by the parties in court and on the record is enforceable even if the agreement is never reduced to writing, signed, or filed"). Nonetheless, there are circumstances in which the court may find an oral agreement unenforceable or may prefer to exercise its discretion to release a party from such an agreement.

The Second Circuit has left open the question of whether state or federal law controls the enforceability of oral settlement agreements, whether in federal-question or diversity cases. See, e.g., Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1283 n.3 (2d Cir. 1996) ("We assume, without deciding, that New York law provides the rule of decision for determining the validity of the oral

8

settlement agreement."). Nonetheless, federal courts in the Second Circuit regularly apply New York law, observing that there is no meaningful substantive difference between federal and New York law with regard to enforceability. See, e.g., Ciamarella v. Readers' Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997) ("[W]e find there is no material difference between the applicable state law or federal common law standard"); Monaghan, 73 F.3d at 1283 ("[T]he federal rule regarding oral stipulations does not differ significantly from the New York rule"); see also Lyman v. New York & Presbyterian Hosp., 2012 WL 6135354, *2-4 (S.D.N.Y. Dec. 11, 2012); Willgerodt ex. rel. v. Hohri, 953 F. Supp. 557, 560 n.1 (S.D.N.Y. 1997).

In determining whether oral agreements are enforceable in the absence of a fully executed document, the courts are guided by the intent of the parties, as demonstrated by their "words and deeds". Winston v. Mediafare Ent'mt Corp., 777 F.2d 78, 80 (2d Cir. 1986). In Winston, the Second Circuit specified four factors that should guide the court's inquiry into whether the parties intended to be bound by the oral agreement at issue:

> (1) whether there has been express reservation of the right not to be bound in the absence of writing; (2) whether there has been partial performance of the

9

contract; (3) whether all of the terms of the alleged
contract have been agreed upon; and, (4) whether the
agreement at issue is the type of contract that is
usually committed to writing.

Id.. Accord, e.g., Powell, 497 F.3d at 129. No single factor is
dispositive; rather, all four factors should be considered for
their bearing on the parties' intent in the context of the entire
case. See, e.g., id. at 129-30; Langreich v. Gruenbaum, 775 F.
Supp.2d 630, 636 (S.D.N.Y. 2011); Lindner v. Am. Express Corp.,
2007 WL 1623119, at *4 (S.D.N.Y. June 5, 2007).


B.  Assessment


We address the Winston factors seriatim. All favor non-
enforcement of the terms agreed to on March 18.


(1) "Express" Reservation. The parties did not expressly state
that the agreement was contingent on a negotiated written contract,
but the court may also look to whether the litigants shared that
implied assumption. See, e.g., Sprint Communics. Co. v. Jasco
Trading, Inc., 5 F. Supp.3d 323, 332-35 (E.D.N.Y. 2015); Lyman, 2012
WL 6135354 at *5-6. In this case that reservation was plainly
understood, since the points of agreement left key details --

including the mechanism, if any, for enforcing the non-disparagement agreement (the provision most important to Fordham) -- entirely unaddressed. In addition, the draft Settlement Agreement proffered by defendants contained a series of provisions that conditioned performance on "execution" of a written contract. Thus, for example, payment was to be made a specified number of days after the signing of an agreement (Settlement Agreement ¶¶ 5, 11(B)), and plaintiff was to provide a stipulation of dismissal at the time of execution. (Id. ¶ 5(E)). Moreover, the draft specified that plaintiff was to have a seven-day period after execution in which to revoke her agreement (id. ¶ 11(B)), and also recited that plaintiff "understands the meaning and effect of the execution of this Settlement Agreement and General Release". (Id. at second page). Additionally, the draft contained a merger clause stating "that this Agreement supercedes any and all agreements, whether written or oral, between Johnson and Fordham." (Id. ¶ 2). See, e.g., Sprint Communics., 5 F. Supp.2d at 334-35; Lyman, 2012 WL 6135354 at *5-6.

Moreover, if there were any doubt on the matter, the court explicitly stated that the settlement was contingent on a written agreement, an observation reflecting the skeletal nature of the accord reached at the conference. Significantly, neither side offered any suggestion that this statement was mistaken even though

they both had the opportunity to do so.

We note also that although Fordham seeks to imply at one point that the court's statement does not mean what it says, we were quite explicit and unambiguous. Finally, defendants also hang their hat in part on the fact that District Court issued a 45-day order shortly after the conference, supposedly a signal that the court understood that there had been a binding agreement. (Defts' Mem. In Further Support 5). Far from it; such orders are frequently issued in cases in which the parties indicate their tentative agreement on a resolution, and it explicitly leaves open to the parties the option to reinstate the case in the event that the settlement is not consummated. If this type of order amounted to a finding that a binding agreement had been reached -- a determination that realistically could not be made, in the event of a dispute, without motion practice -- then the order should instead leave open only the option of a motion to enforce.

2. <u>Partial Performance</u>. There has been no partial performance by either party. In resisting this conclusion, defendants cite some caselaw for the proposition that the drafting of a settlement agreement may constitute partial performance. (<u>See</u> Defts' Mem. 9-10)(citing <u>inter alia</u> <u>Pullman v. Alpha Media Pub., Inc.</u>, 2014 WL

12

5043319, *11 (S.D.N.Y. March 14, 2014); <u>Jackson v. New York City
Dep't of Educ.</u>, 2012 WL 1986593, *3 (S.D.N.Y. June 14, 2012)). This
is plainly incorrect, at least in the current context.

The drafting of a proposed agreement is consistent with the
parties having reached agreement, but it is equally consistent with
their having not yet agreed on material terms. <u>E.g.</u>, <u>Sprint
Communics.</u>, 5 F. Supp.3d at 335-36. Indeed, until there has been an
agreement, there can be no definitive determination of what
performance is required and thus what action constitutes performance
of the contract. In any event, the term "performance", properly
understood, refers to the carrying out of an obligation defined by
an agreement, not the negotiation of an agreement.[2]

---

[2] In some instances the drafting of a document may be deemed
part performance. Thus a defendant may prepare a letter of
reference if that is required by a prior agreement, and that act
of drafting could be characterized as a form of performance. <u>See</u>,
<u>e.g.</u>, <u>Powell</u>, 497 F.3d at 130; <u>Sprint Communics.</u>, 5 F. Supp.3d at
336 n.5. Similarly, if the parties agree orally on all material
terms and further agree that one side would draft a written
instrument embodying those terms, the consequent drafting might
arguably amount to partial performance. <u>See</u>, <u>e.g.</u>, <u>Lyman</u>, 2012 WL
6135354 at *7 (discussing <u>Jackson</u>, 2012 WL 1986591 at *1; <u>United
States v. U.S. Currency in the Sum of Six Hundred Sixty Thousand
Dollars</u>, 423 F. Supp.2d 14, 28-29 (E.D.N.Y. 2006)). <u>But see
Sprint Communics.</u>, 5 F. Supp.3d at 336 n.5 (looking only to
performance of substantive terms of agreement); <u>Lyman</u>, 2012 WL
6135354 at *7-8 (same); <u>Langreich</u>, 775 F. Supp.2d at 636-37.

The only way in which any sense can be made of defendants'
suggestion is if one first assumes the very conclusion in question
-- that is, that the parties reached a binding oral agreement on
March 18 and that the agreement included a requirement that the
defendant prepare a document embodying the terms of the agreement.
While such a state of affairs may well be found in some cases, see,
e.g., Jackson, 2012 WL 1986593 at *1, that depends on the specific
circumstances of the case. If divorced from that inquiry, the
invocation of the drafting process as evidence of a prior binding
agreement is obviously circular, since the drafting can represent --
and in this case plainly does -- simply an effort to reach a binding
agreement. E.g., Sprint Communics., 5 F. Supp. at 336 n.5 (drafting
was part of negotiating process; court therefore looks to whether
any party performed an obligation created by the substance of the
purported agreement); Lyman, 2012 WL 6135354 at *7-8; Langreich, 775
F. Supp.2d at 636-37.

In this instance the only terms that even the defendants
proffer as having been agreed to on March 18 consist of a monetary
payment, non-disclosure, non-disparagement provisions, no rehiring
of plaintiff and a neutral reference by Fordham. (Defts' Mem. 3-4).
They point to no act on their part that represents any form of
performance of any of these terms, and the fact that they drafted

a document that concededly deviates from the very terms that they cite as agreed to on March 18 reflects that the preparation of a draft was an aspect of the negotiation process, and not the fulfillment of any requirement of a March 18 agreement. See, e.g., Nieves v. Community Choice Health Plan of Westchester, Inc., 2011 WL 5531018, *4 (S.D.N.Y. Nov. 14, 2011); see also Lyman, 2012 WL 6135354 at *7-8.

3. Agreement on All Terms. As of the conclusion of the March 18 conference, the parties had not agreed on all terms. As noted, they had not even discussed how the provisions embodying the non-disclosure and non-disparagement requirements were to be enforced. They also had not addressed whether the non-disparagement provision, insofar as it applied to defendants, would bind Father Ciorra -- an issue later aired at the May 5 conference -- and they had not addressed what became a later demand by Fordham that it cover a non-party, Father McShane. Wholly apart from these issues, the draft Settlement Agreement authored by defendants' counsel covers a vast array of issues that were never even touched upon at the conference.[3]

_____

[3] Defendants refer to two emails during the post-conference negotiating period when plaintiff's counsel alluded to the parties getting close to an agreement. (Donnelly Decl. ¶¶ 14, 17 & Exs. C (we ... are fine with most of it"), D ("I think that

4. Agreement Typically in Writing. The Second Circuit has noted that a settlement "containing perpetual rights", such as "how future requests for employer references would be handled, prohibiting the employee from reapplying for employment with the defendant and imposing confidentiality requirements," would typically be reduced to written form. Powell, 497 F.3d at 130. See also Lyman, 2012 WL 6135354 at *8 (quoting Bonnelle v. Long Island College Hosp., 3 N.Y.3d 281, 288-89, 785 N.Y.S.2d 738, 740-41 (2004)). The draft agreement, as written by defendants, encompasses all of these terms, thus supporting the notion that a signed writing was a sine qua non of an enforceable agreement. See, e.g., Lyman, 2012 WL 6135354 at *8.

The quoted observation from Powell echoes the experience of this court that agreements in cases of this kind -- that is, contracts to resolve lawsuits asserting claims of employment discrimination and retaliation -- are almost invariably reduced to a writing, the process for which commonly involves further negotiation over specific terms, some substantive and some

---

[the parties are] pretty close"); see Defts' Mem. 4). This invocation of such language is entirely unpersuasive. As the Second Circuit has noted, even a statement by an attorney that "we have a deal" did not demonstrate that signing of an agreement was unnecessary to bind the parties. Ciaramella, 131 F.3d at 325. See, e.g., Sprint Communics., 5 F. Supp.3d at 333-34.

procedural. Among the issues that demanded written specification in this case were the details of any releases; indeed, the draft agreement proffered by Fordham contains a lengthy provision defining the scope of the release that it demanded of Dr. Johnson (Settlement Agreement ¶ 3), and other sections provide further descriptions of the claims and remedies that she would be surrendering. (Id. ¶¶ 4, 8). Furthermore, in view of the fact that Dr. Johnson was waiving any claim for age discrimination, the written agreement contains a notice to her that she had a right to rescind her acceptance within seven days after execution of the agreement, and a further notice that she retained the right to challenge the waiver of her rights by the specified release. (Id. ¶ 3). The draft also included a provision stating that although plaintiff had a 21-day period to consider whether she wanted to enter the agreement, she was waiving that right. (Id. ¶ 11(A)). Other provisions addressed the potential tax treatment of the payment to plaintiff. (Id. ¶¶ 6-7). Additional terms addressed possible exposure relating to Medicare and Medicaid liens. (Id. ¶¶ 12-16). Indeed, the draft agreement prepared by defendant runs to no less than 13 pages of text, ample evidence that the agreement that Fordham contemplated necessarily had to be reduced to a writing. See, e.g., Sprint Communics., 5 F. Supp.3d at 338-40.

In sum, all the pertinent indicia support the conclusion that the agreements reached at the March 18 conference did not amount to an enforceable settlement.

II. Rescission

Even if we were to conclude that the statements of the parties at the March 18 conference amounted to an enforceable agreement, the actions of Fordham following that event reflect that at present it cannot enforce whatever agreement was reached in March. Simply stated, Fordham subsequently and effectively sought to rescind the agreement.

As noted, some weeks after the conference, and in the course of discussions with plaintiff's attorneys, defendants' counsel presented the first draft of the proposed settlement agreement, and that draft materially deviated from some of the terms that both sides acknowledge were agreed to on March 18. Most notably, Fordham withdrew from its agreement for a mutual non-disparagement provision and substantially altered the scope of the non-disclosure provision to encompass far more than simply the terms of the settlement. Both of these provisions were far from trivial, and the changes materially altered what had previously been agreed to.

In seeking to justify these changes, at the May 5 conference Fordham's counsel noted that before preparing the draft defendants had learned of at least one of Dr. Johnson's letters to the Pope -- apparently sent in February 2015 -- which Fordham viewed as an early violation of the agreements reached on March 18. Fordham may well have been correct in viewing that letter and a follow-up letter as inconsistent with an agreement prohibiting disparagement and disclosure of settlement terms, and, if so, defendants were free to proceed as they did, by effectively withdrawing from the terms that they had previously agreed to. In short, a party to a contract may choose to rescind in the face of a material breach by the other side. See, e.g., Frank Felix Assocs. Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 288-89 (2d Cir. 1997)(citing Restatement (Second) of Contracts § 241 & 281, cmt. b (1981)); accord New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117-18 (2d Cir. 2006)(quoting Callanan v. Powers, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)).[4]

---

[4] We note that defendants' counsel appears to indicate that she only learned of Dr. Johnson's second letter, dated April 29, 2015, on May 4, 2015, well after drafting the first version of the Settlement Agreement. (Donnelly Decl. ¶ 20). Our recollection and notes from the May 5 conference reflect that defendants' attorney indicated that the shaping of the early April version of the Settlement Agreement was in response to defendants learning that plaintiff had sent an earlier letter (apparently in

Nonetheless, by proceeding in this fashion, Fordham was choosing among alternatives, and most pertinently it was thereby surrendering its right to enforce the contract. Simply stated, a contracting party that chooses to rescind may not also demand specific performance of the same contract. See, e.g., Assured Guar. Munic. Corp. v. DB Structured Prods., Inc., 44 Misc.3d 1206(A), 997 N.Y.S.2d 97, 2014 WL 3282310, *7 (Sup. Ct. N.Y. Cty. July 3, 2014)(citing cases). See also DiBartolo v. Battery Place Assocs., 84 A.D.3d 474, 475-76, 922 N.Y.S.2d 357, 358 (1ˢᵗ Dep't 2011)(plaintiffs' earlier demand to rescind purchase contract precludes their current application for specific performance). Thus, even if the March 18 agreements had been deemed at that time an enforceable contract, Fordham's later course of conduct precluded its ability at that time to obtain enforcement.

Defendants seem at one point to anticipate this problem and to seek to rebut it by pointing out that at the May 8 telephone conference they represented that they would drop the liquidated

February) that was inconsistent with the March 18 agreements. Technically, the February letter was not a breach of a later agreement, though the late April letter presumably was. Since the defendants' implicit repudiation of aspects of the March 18 agreements occurred before the April 29 letter, they might have had no basis at the time to rescind an otherwise binding agreement. In view of our conclusion that the March 18 understandings were not binding, this is a moot point.

damages provision embodied in the draft written settlement agreement. (Donnelly Decl. ¶ 22; Defts' Mem. 6; Defts' Mem. in Further Support 5). We infer that defendants would further rely on the fact that at the May 5 conference they reported that they would agree to mutuality of the non-disparagement and non-disclosure obligations. The obvious problem with this rearrangement of defendants' settlement posture is that it came too late. By the May 5 conference plaintiff had decided that she was no longer willing to agree to a non-disparagement requirement, and hence there was simply no meeting of the minds between her and defendants after the defendants' effective rescission in early April.

In short, by May 5 the earlier agreement, even if previously enforceable, was by then ancient history. Or to rephrase the point, once defendants squeezed the toothpaste from the tube, they were unable to push it back in.

### III. Plaintiff's Right to Rescind

Defendants' draft settlement agreement recites that because plaintiff was being required to release any claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., she was entitled "to cancel the Agreement within seven (7) days from

21

execution". (Settlement Agreement ¶ 11(B)). This paragraph of the draft references a provision of the ADEA -- that is, the OWBPA, 29 U.S.C. §§ 636(f)(1)(A)-(G) -- which specifies certain procedural protections for older workers when they waive "any right or claim under this Chapter". Among those protections is a right to rescind an agreement that waives any ADEA claim, provided that the revocation is within seven days after execution of the settlement agreement. 29 U.S.C. § 636(f)(1)(G).

It is not clear that the cited section of the OWBPA actually requires the revocation right embodied in defendants' draft. See Powell, 497 F.3d at 132 (discussing 29 U.S.C. § 636(f)(2)(in lawsuit individual must be given "a reasonable period of time within which to consider the settlement agreement")). That said, defendants chose, by their draft Settlement Agreement, to accord Dr. Johnson that protection, and in doing so they designed the agreement to conform to the statute.[5] If plaintiff was free to cancel within seven days after execution of a written agreement -- a right that, even if not statutory, was at least intended by defendants to be contractual -- it follows that she cannot be compelled to adhere to

_____

[5] We assume that this provision reflects a considered decision by counsel and client to adhere to a specific and statutorily blessed time frame, since the term "reasonable period of time" is fairly opaque.

an oral agreement, that is, one never executed.

CONCLUSION

For the reasons stated, we recommend that defendants' motion to enforce a settlement agreement by plaintiff be denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Andrew L. Carter, Room 1306, 500 Pearl Street, New York, New York 10007, and to the chambers of undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636 (b) (1); Fed. R. Civ. P. 72, 6(a), 6(d).

Dated: New York, New York
       September 24, 2015


                    RESPECTFULLY SUBMITTED,


                    _____
                    MICHAEL H. DOLINGER
                    UNITED STATES MAGISTRATE JUDGE